EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
KATHARINE SCHONBACHLER
Assistant United States Attorney
Asset Forfeiture Section
California Bar No. 222875
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3172
    Facsimile: (213) 894-7177
    E-mail: Katie.Schonbachler@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>$4,000,000.00 IN COMERICA BANK FUNDS,<br><br>        Defendant. | No. CV 15-8538<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br><br>[21 U.S.C. § 881(a)(6); 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984]<br><br>[D.E.A.] |

    The United States of America brings this claim against the defendant $4,000,000.00 in Comerica Bank Funds (the "defendant bank funds"), and alleges as follows:

# JURISDICTION AND VENUE

1. This is a civil forfeiture action brought pursuant to 21 U.S.C. § 881(a)(6), 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984.

2. This Court has jurisdiction over the subject matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

# PERSONS AND ENTITIES

4. The plaintiff is the United States of America.

5. The defendant is $4,000,000.00 in bank funds seized from a Comerica Bank account with the last four digits of 9151 (the "9151 Account") on June 6, 2012, pursuant to a federal seizure warrant. The defendant bank funds were seized at Comerica Bank located at 525 North Brand Avenue, Glendale, California.

6. The defendant bank funds are in the custody of the United States Marshals Service in this District, where they shall remain subject to this court's jurisdiction during the pendency of this action.

7. The interests of the accountholders of the 9151 Account may be adversely affected by these proceedings.

# EVIDENCE SUPPORTING FORFEITURE

*Background of the Investigation*

8. In approximately April 2010, agents with the Drug Enforcement Administration ("DEA") Los Angeles Field Division's Financial Investigations Group ("LAFD-FIG") (hereinafter referred to as "agent" or "agents") initiated an investigation (Operation Rush Hour) targeting high-level money launderers connected to Joaquin "El Chapo" Guzman-Loera ("Chapo") and other members and associates of the Sinaloa Drug Cartel ("the Organization"). The investigation revealed that:

    a. the Organization's drug trafficking and financial operations were compartmentalized;

    b. the financial operations in Mexico were directed by a group of money

brokers who were provided information on drug proceeds to be picked up and laundered by counterparts engaged in the drug trafficking operations (the undercover portion of Operation Rush Hour involved picking up drug proceeds and laundering them at the direction of these money brokers);

   c. each of the money brokers identified had multiple "clients" involved in drug trafficking operations. These clients collectively represented drug cells operating throughout the United States, Canada, Europe and Asia that generated millions of dollars in drug trafficking proceeds every week;

   d. the money brokers used an array of bank accounts in Mexico, Asia, Central and South America and the United States to launder drug proceeds; and

   e. one of the accounts into which the money brokers directed undercover agents and officers to deposit the collected drug proceeds was the 9151 Account from which the defendant bank funds were seized.  Between October 20, 2011 and May 1, 2012, a total of $4,717,302.00 in drug proceeds was wire transferred to the 9151 Account pursuant to the money brokers' instructions, as discussed in greater detail below.

  9. In or around October 2011, an undercover agent ("UC1") successfully infiltrated the Organization and began coordinating directly with the Mexico-based money brokers, including Cuauthemoc Quintero-Angulo ("Cheto") and Marco Ivan Zaragoza-Pelayo ("Julio").[1]  UC1 posed as a Colombian money laundering organization's primary representative in the United States and Canada, claiming he had subordinates in several states and regions throughout the world. UC1 represented that, due to his position, all transactions were to be coordinated by him, even though he might later assign a subordinate to complete certain transactions.

---

[1] On September 7, 2012, the government filed an indictment in United States v. Zaragoza-Pelayo et al., Case No. 12-CR-853 in the Central District of California.  The named defendants in that case, including Julio, were arrested in Mexico and the United States is currently seeking their extradition.  Cheto was murdered in his home in Tijuana, Mexico in May 2012.

10. At a meeting in Panama on or about October 28, 2010, UC1 was introduced to Cheto by a cooperating source. During that meeting, Cheto and UC1 discussed Cheto's operations and UC1 learned that Cheto was connected with Julio and other high-level money brokers.

11. During the Panama meeting, UC1 asked Cheto whether Cheto worked on behalf of the Zetas drug trafficking organization or on behalf of the "short guy." Cheto asked whether UC1 was referring to Chapo, and UC1 confirmed that he was. Cheto stated that 90% of Cheto's business came from Chapo's organization. Cheto also stated that he knew Ismael "El Mayo" Zambada, the head of the Zambada drug trafficking organization and a leader within the Sinaloa Drug Cartel, and Juan Jose Esparragoza Moreno (aka El Azul), another leader within the Sinaloa Drug Cartel.

12. Cheto's statements to UC1 that he and the other money brokers were connected with Chapo and the Organization were consistent with statements made at other times to UC1 by Julio.

13. On October 29, 2011, UC1 met again with Cheto, this time to discuss international drug trafficking. During the meeting, UC1 stated that his organization could transport large loads of cocaine from Panama to the United States and other ports throughout the world. Cheto told UC1 that he had customers who could use such services, and Cheto and UC1 discussed prices and logistical details. Cheto asked whether UC1 could arrange transportation from Colombia to Miami, Florida. UC1 responded that UC1 did not know but could find out.

14. After Cheto had directed a series of successful undercover drug proceeds pick-ups by Undercover Officers (the "UCs"), Cheto in January 2012 agreed to introduce UC1 and two other UCs to Julio, and a meeting was held on January 11, 2012, in Panama City, Panama. At that meeting, Julio stated that he worked on behalf of Chapo and other drug traffickers operating from Mexico. Julio stated that he engaged in drug trafficking and money laundering, and moved drugs to Atlanta, Georgia. In later conversations with UC1, Julio stated that he also moved drugs to Canada.

15. In March 2012, Julio asked UC1 whether UC1 could pick up a large quantity of currency in the United States and deliver it to Costa Rica. In furtherance of that request, LAFD-FIG personnel later picked up $240,000.00 in drug proceeds and processed it for transportation to Costa Rica.

16. On March 15, 2012, UC1 and another LAFD-FIG UC met with Julio in San José, Costa Rica to deliver the $240,000.00. This was designed to be a test run to meet Julio's need to have bulk currency picked up in the United States and delivered to Costa Rica. As discussed below, UC1 picked up additional drug proceeds on several more occasions from Julio, who would provide bank account numbers to the UCs for them to wire the funds into those bank accounts.

*Overview of the Narcotics Money Laundering Scheme*

17. The Rush Hour narcotics money laundering scheme followed the same general process for each transaction: When a high-level drug trafficker had drug proceeds that needed to be picked up in the United States, laundered and transferred to Mexico, the drug trafficker would contact a money broker such as Julio. The broker would then contact UC1 to coordinate the pickup of the currency and provide the details of the transaction (the location and amount of the currency to be picked up and a name and telephone number for the money broker's representative or money courier responsible for delivering the drug proceeds).

18. UC1 or another UC would then contact the money broker's representative or money courier to coordinate the money pick-up. The UCs would meet the money couriers in a shopping mall parking lot or similar location somewhere in the United States to pick up the drug proceeds. The money would then be deposited into a DEA undercover bank account at City National Bank in the name of a fictitious business, Bebig Industries ("Bebig"). This account and other undercover accounts ("DEA Bebig Accounts") were then used to wire - - at Julio's direction - - funds to various individual and business bank accounts, including the 9151 Account in the name of a media related business located in Michigan. UC1 would report the amount of the picked up proceeds

to the money brokers involved. Julio or another money broker would then instruct UC1 to wire the money to bank accounts of specific individuals and businesses in the United States and Mexico. Specifically, Julio would provide the account numbers to UC1 and the amount to transfer to each account.

19. During the investigation, UC1 had numerous conversations with Cheto and Julio during which it was made clear that the proceeds being picked up by the undercover operation were derived from drug trafficking.

*Summary of Drug Proceeds Transfers To The 9151 Account*

20. The 9151 Account was one of the accounts identified by the money brokers as an account into which drug proceeds were to be deposited. Between October 2011 and May 2012, Julio and Julio's co-conspirators arranged several drug proceeds pick-ups throughout the United States, including 20 pickups totaling just over $5,266,235. Of that amount, $4,717,305 was wired into the 9151 Account at Julio's direction. Below is a summary of the 20 money pick-ups:

  a. On or about October 19, 2011, Cheto contacted UC1 and requested a money pick-up in the Atlanta, Georgia area for approximately $150,000. The Los Angeles based agents coordinated this money pick-up with DEA's Atlanta Field Division ("AFD") and on October 20, 2011, an AFD UC picked up $151,960 from a Hispanic male identified as Anuar (last name unknown) ("LNU") in Marietta, Georgia. On October 26, 2011, Cheto provided UC1 with wiring instructions to send $142,840 to the 9151 Account. On or about October 26, 2011, $142,840 was wired from a DEA Bebig Account to the 9151 Account.

  b. On or about October 19, 2011, Cheto contacted UC1 and requested a money pick-up in the Atlanta, Georgia area for approximately $700,000. The Los Angeles based agents coordinated this money pick-up with AFD and on October 21, 2011, an AFD UC picked up $806,800 from two Hispanic males, one of them identified as Angel LNU, in Atlanta, Georgia. On October 26, 2011, Cheto provided UC1 with wiring instructions to send $758,390 to the 9151 Account. On or about October 26,

2011, $758,390 was wired from a DEA Bebig Account to the 9151 Account.

   c. On or about October 25, 2011, Cheto contacted UC1 and requested a money pick-up in the Chicago, Illinois area.  The Los Angeles based agents coordinated this money pick-up with DEA's Chicago Field Division ("CFD") and on November 2, 2011, a CFD UC picked up $361,500 from a Hispanic male identified as J. Inez Rodriguez and a second unknown Hispanic male in the Chicago, Illinois area.  On November 4, 2011, Cheto provided UC1 with wiring instructions to send $339,810 to the 9151 Account.  On or about November 4, 2011, $339,810 was wired from a DEA Bebig Account to the 9151 Account.

   d. In late October 2011, Cheto contacted UC1 and requested a money pick-up in the Atlanta, Georgia area.  The Los Angeles based agents coordinated this money pick-up with AFD and on November 2, 2011, an AFD UC picked up $304,801 from a Hispanic male identified as Angel LNU in Norcross, Georgia.  On November 3, 2011, Cheto provided UC1 with wiring instructions to send $286,512 to the 9151 Account.  On or about November 4, 2011, $286,512 was wired from a DEA Bebig Account to the 9151 Account.

   e. In late October, 2011, Cheto contacted UC1 and requested a money pick-up in the Chicago, Illinois area.  The Los Angeles based agents coordinated this money pick-up with CFD and on November 4, 2011, a CFD UC picked up $149,830 from a Hispanic male identified as Orlando Isais in Berwyn, Illinois.  On November 7, 2011, Cheto provided UC1 with wiring instructions to send $140,840 to the 9151 Account.  On or about November 9, 2011, $140,840 was wired from a DEA Bebig Account to the 9151 Account.

   f. On or about November 3, 2011, Cheto contacted UC1 and requested a money pick-up in the Atlanta, Georgia area.  The Los Angeles based agents coordinated this money pick-up with AFD and on November 4, 2011, an AFD UC picked up $294,990 from a Hispanic male identified as Jose LNU in Marietta, Georgia.  On November 7, 2011, Cheto provided UC1 with wiring instructions to send $277,290 to

the 9151 Account. On or about November 10, 2011, $277,290 was wired from a DEA Bebig Account to the 9151 Account.

      g.    On or about November 4. 2011, Cheto contacted UC1 and requested a money pick-up in the Atlanta, Georgia area. The Los Angeles based agents coordinated this money pick-up with AFD and on November 7, 2011, an AFD UC picked up $447,170 from a Hispanic male identified as Anuar LNU in Marietta, Georgia. On November 10, 2011, Cheto provided UC1 with wiring instructions to send $420,340 to the 9151 Account. On or about November 10, 2011, $420,340 was wired from a DEA Bebig Account to the 9151 Account.

      h.    In late November, 2011, Cheto contacted UC1 and requested a money pick-up in the Chicago, Illinois area. The Los Angeles based agents coordinated this money pick-up with CFD and on November 30, 2011, a CFD UC picked up $193,825 from a Hispanic male identified as Rolando Oliver Valle in Chicago, Illinois. On December 2, 2011, Cheto provided UC1 with wiring instructions to send $182,195 to the 9151 Account. On or about December 2, 2011, $182,195 was wired from a DEA Bebig Account to the 9151 Account.

      i.    On or about November 19, 2011, Cheto contacted UC1 and requested a money pick-up in the Newark, New Jersey area. The Los Angeles based agents coordinated this money pick-up with DEA's Newark Field Division ("NFD") and on December 2, 2011, a NFD UC picked up $649,900 from an individual identified as Jong Park in Fort Lee, New Jersey. On December 7, 2011, Cheto provided UC1 with wiring instructions to send $473,106 to the 9151 Account. On or about December 7, 2011, $473,106 was wired from a DEA Bebig Account to the 9151 Account.

      j.    On or about March 5, 2012, Julio contacted UC1 and requested a money pick-up in the Atlanta, Georgia area for approximately $450,000. The Los Angeles based agents coordinated this money pick-up with AFD and on March 7, 2012, an AFD UC picked up $449,980 from a Hispanic male identified as Dennis Alvarez-Boquin in Marietta, Georgia. On March 12, 2012, Julio provided UC1 with wiring

instructions to send $187,000 to the 9151 Account. On or about March 12, 2012, $187,000 was wired from a DEA Bebig Account to the 9151 Account. On March 13, 2012, Julio provided UC1 with wiring instructions to send an additional $187,000 to the 9151 Account. On or about March 13, 2012, an additional $187,000 was wired from a DEA Bebig Account to the 9151 Account.

   k. On or about March 12, 2012, Julio contacted UC1 and requested a money pick-up to be conducted in Los Angeles for approximately $100,000. On March 13, 2012, a UC picked up $100,000 from a Hispanic male known only as "Chooky", in Montebello, California. On March 15, 2012, Julio provided UC1 with wiring instructions to send $94,000 to the 9151 Account. On or about March 15, 2012, $94,000 was wired from a DEA Bebig Account to the 9151 Account.

   l. On or about March 19, 2012, Julio contacted UC1 and requested a money pick-up in Los Angeles for approximately $155,000. On March 20, 2012, a UC picked up $152,600 from a Hispanic male identified as Raul Navarro-Galvan in Montebello, California. On March 21, 2012, Julio provided UC1 with wiring instructions to send $149,548 to the 9151 Account. On or about March 22, 2012, $149,548 was wired from a DEA Bebig Account to the 9151 Account.

   m. On or about April 2, 2012, Julio contacted UC1 and requested a money pick-up in Los Angeles for approximately $240,000. On April 4, 2012, a UC picked up $239,419 from two unknown Hispanic males in Montebello, California. On April 5, 2012, Julio provided UC1 with wiring instructions to send $234,630 to the 9151 Account. On or about April 5, 2012, $234,630 was wired from a DEA Bebig Account to the 9151 Account.

   n. On or about April 6, 2012, Julio contacted UC1 and requested a money pick-up in New York, New York for approximately $600,000. The Los Angeles based agents coordinated this money pick-up with DEA's New York Field Division ("NYFD") and on April 10, 2012, a NYFD UC picked up $194,960 from a Hispanic male identified as Andres Alvarez in New York, New York. On April 12, 2012, Julio

provided UC1 with wiring instructions to send $183,262 to the 9151 Account. On or about April 13, 2012, $183,262 was wired from a DEA Bebig Account to the 9151 Account.

      o.    On April 27, 2012, Julio contacted UC1 and requested a money pick-up in the Columbus, Ohio area for approximately $100,000. The Los Angeles based agents coordinated this money pick-up with a Columbus District Office ("CDO") and on April 27, 2012, a CDO UC picked up $60,000 from an unidentified Hispanic male in Columbus, Ohio. On April 28, 2012, Julio provided UC1 with wiring instructions to send $56,000 to the 9151 Account. On or about May 3, 2012, $56,000 was wired from a DEA Bebig Account to the 9151 Account.

      p.    On April 26, 2012, Julio contacted UC1 and requested a money pick-up in Los Angeles for approximately $45,000. On April 27, 2012, a UC picked up $44,980 from an unknown Hispanic male in Montebello, California. On April 28, 2012, Julio provided UC1 with wiring instructions to send $44,000 to the 9151 Account. On or about May 3, 2012, $44,000 was wired from a DEA Bebig Account to the 9151 Account.

      q.    On April 26, 2012, Julio contacted UC1 and requested a money pick-up in Los Angeles. On April 27, 2012, a UC picked up $195,600 from a Hispanic male identified as Jose Roberto Hernandez in Montebello, California. On April 28, 2012, Julio provided UC1 with wiring instructions to send $102,000 to the 9151 Account. On or about May 3, 2012, $102,000 was wired from a DEA Bebig Account to the 9151 Account.

      r.    On April 27, 2012, Julio contacted UC1 and requested a money pick-up in Los Angeles. On May 1, 2012, a UC picked up $138,000 from a Hispanic male identified as Guerito LNU in Montebello, California. On May 4, 2012, Cheto and Julio provided UC1 with wiring instructions to send $135,240 to the 9151 Account. On or about May 4, 2012, $102,000 was wired from a DEA Bebig Account to the 9151 Account.

    s. On April 27, 2012, Julio contacted UC1 and requested a money pick-up in Los Angeles.  On May 1, 2012, a UC picked up $100,000 from an unknown Hispanic male in Montebello, California.  On May 3, 2012, Julio provided UC1 with wiring instructions to send $98,000 to the 9151 Account.  On or about May 3, 2012, $98,000 was wired from a DEA Bebig Account to the 9151 Account.

    t. On April 27, 2012, Julio contacted UC1 and requested a money pick-up in Los Angeles.  On May 1, 2012, a UC picked up $229,900 from Jose Roberto Hernandez in Pomona, California.  On May 4, 2012, Julio provided UC1 with wiring instructions to send $225,302 to the 9151 Account.  On or about May 4, 2012, $225,302 was wired from a DEA Bebig Account to the 9151 Account.

21. In sum, Julio directed the UCs to deposit a total of $4,717,305 into the 9151 Account between October 2011 and May 2012.  The defendant $4,000,000.00 was seized from the 9151 Account on June 6, 2012.

## FIRST CLAIM FOR RELIEF

22. Plaintiff alleges that the defendant bank funds represent or are traceable to proceeds of illegal narcotic trafficking or were intended to be used in one or more exchanges for a controlled substance in violation of 21 U.S.C. § 841, et seq.  The defendant bank funds are therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) (governing proceeds and intent to use in narcotic trafficking violations) and 18 U.S.C. § 981(a)(1)(C) (governing proceeds of specified unlawful activity, including drug trafficking).  To the extent that the defendant bank funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account as the property involved in the specified offenses, rendering them subject to forfeiture pursuant to 18 U.S.C. § 984.

///

## SECOND CLAIM FOR RELIEF

23. Plaintiff further alleges that the defendant bank funds are subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 984 because they were involved in one or more violations of 18 U.S.C. §§ 1956 (money laundering) and 1957 (transactions in criminally-derived proceeds).

WHEREFORE, plaintiff United States of America prays that:

(a) due process issue to enforce the forfeiture of the defendant bank funds;

(b) due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) this Court decree forfeiture of the defendant bank funds to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: November 2, 2015

EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Civil Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

/s/ Katharine Schonbachler
KATHARINE SCHONBACHLER
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

VERIFICATION

I, Theodore C. Russell, hereby declare that:

1. I am a Special Agent with the Drug Enforcement Administration and am the case agent for the forfeiture matter entitled <u>United States of America v. $4,000,000.00 in Comerica Bank Funds</u>.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed October 5, 2015 in Los Angeles, California.

_____
Theodore C. Russell